UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

RICKY JAVON GRAY,  )
 )
Petitioner,  )
 )
v.  )   Case No. 1:11-cv-630 (AJT/TCB)
 )
EDDIE L. PEARSON,  )
 )
Respondent.  )
_____ )

## MEMORANDUM OPINION

This matter is before the Court on the respondent's Motion to Dismiss the Petition for Writ of Habeas Corpus [Doc. No. 31]. Petitioner Ricky Javon Gray ("petitioner" or "Gray") was convicted in the Circuit Court of the City of Richmond for the murders of Bryan, Kathryn, Stella, and Ruby Harvey. Following a jury trial, Gray was sentenced to life imprisonment for the murders of Bryan and Kathryn Harvey and was sentenced to death for the murders of Stella and Ruby Harvey. For the reasons stated herein, the Court will grant respondent's Motion and dismiss Gray's Petition for a Writ of Habeas Corpus.

### I. Background

### A. Guilt Phase of the Trial

On January 1, 2006, Kathryn and Bryan Harvey and their two daughters, Stella and Ruby, were murdered in the basement of their home in Richmond, Virginia. *Gray v. Commonwealth*, 274 Va. 290, 295 (2007) ("Gray I").[1] Firefighters discovered the bodies of the family when they responded to a call that the home was burning. *Id.* Near the

---

[1] The facts presented in this Memorandum Opinion are taken from the Supreme Court of Virginia's opinion in Gray's direct appeal, referred to as "Gray I." The Supreme Court of Virginia's opinion dismissing Gray's state habeas petition is referred to as "Gray II." Citations to the Joint Appendix of the direct appeal are notated as "J.A."; citations to Gray's state petition are notated as "State Pet."; and citations to Gray's federal petition are notated as "Fed. Pet."

bodies the police found two claw hammers, two broken wine bottles, a knife handle, and

a separate knife blade. *Id.* at 295-96. As summarized in state court proceedings,

autopsies of the bodies revealed the following:

> Bryan had been cut eight times in his neck and underneath his chin, and
> those wounds, although "very painful" were not immediately fatal. His
> mouth had been gagged and taped. Six lacerations were made to the left
> side and back of Bryan's skull, each caused by blows from a hammer. He
> experienced severe third degree burns to his skin. Bryan died from the
> wounds to his skull.
>
> Kathryn had been cut three times in her neck and chest, once in her back,
> and those wounds caused bleeding and pain but were not fatal. Multiple
> lacerations were made to Kathryn's skull as a result of blows from a
> hammer. The hammer blows caused a fracture to the plate above
> Kathryn's eyes, resulting in bleeding behind her eyes. Kathryn died from
> the blunt force injuries to her head.
>
> Ruby's throat had been sliced through to her trachea, a wound that was not
> fatal but obstructed her breathing. Her head was also fractured and cut,
> causing brain tissue to exude from her skull. She had also been stabbed in
> the back with enough force that the knife had passed through her ribs and
> into her lungs. Ruby died from the blunt force injuries to her head and the
> stab injury to her lungs.
>
> Stella's neck had been cut six times, with the stab wounds having
> penetrated her trachea and esophagus. Stella's head was also bludgeoned
> by a hammer, causing brain tissue to exude from her skull. She died from
> a combination of smoke inhalation, carbon monoxide poisoning and blunt
> force injury to her head.

*Id.* at 296. At the time of their murders, Stella was nine years old and Ruby was four

years old. *Id.* at 298.

Responding to a tip received later in the week of the murders, members of the

Philadelphia Police Department, working with the Richmond Police Department, located

Gray in Philadelphia and arrested him. *Id.* at 298. After Gray learned that his

accomplice, Ray Dandridge, had made a statement to the police, Gray asked Philadelphia

police if he could "tell [his] side of the story." *Id*; J.A. 990-91. In a signed confession,

Gray described how he and Dandridge entered the Harvey's home and killed the Harveys. *Gray I*, 274 Va. at 298.

At trial, Gray's confession and other evidence established that on the morning of January 1, 2006, Gray, Dandridge, and another accomplice, Ashley Baskerville, were looking for a house to rob. *Id.* at 296. They entered the Harvey's home and forced Bryan, Kathryn, and Ruby into the basement. *Id.* at 296-97. While they were in the basement, a family friend returned Stella to the home and "[h]earing the commotion, Kathryn explained to Gray that her daughter had returned from a slumber party, so Gray permitted Kathryn to go upstairs to bring her daughter downstairs to the basement." *Id.* Kathryn did so without telling the family friend what was happening in the basement. *Id.*

Gray bound the Harveys' hands and feet and placed packing tape over their mouths. *Id.* Gray and Dandridge began looking for and collecting items in the home that they wanted to steal. *Id.* Gray then took a razor knife and cut Kathryn's throat and the girls' throats. In his confession, he was unsure if he or Dandridge had cut Bryan's throat, but was clear that he ultimately killed Bryan, stating "I think [Dandridge] did [Bryan], cut him. But I'm not sure. But it doesn't matter if [Dandridge] did or not cause [Bryan] was still alive after, until I hit him with the hammer." *Id.* at 297 n.5; J.A. 1265. In his confession, Gray also stated:

> It was a real nasty scene. How am I supposed to explain something like what happened? I started cutting their throats and they kept getting up and they were scaring me. I remember seeing the hammer and picking it up, and then . . . I was just hitting them all with the hammer. All I know is nobody was moving when I left out there.

*Gray I*, 274 Va. at 298 (internal modifications omitted). Gray also admitted that Dandridge spent most of the time looking around the home for things to steal and that he was the only one who used the hammers to attack the Harveys. *Id.*

At the conclusion of the guilt phase of the trial, the jury convicted Gray of capital murder of Bryan Harvey in the commission of robbery or attempted robbery under Va. Code § 18.2-31(4); capital murder of Bryan Harvey, Kathryn Harvey, Stella Harvey, and Ruby Harvey as part of the same transaction under Virginia Code § 18.2-31(7); capital murder of Bryan Harvey, Kathryn Harvey, Stella Harvey, and Ruby Harvey within a three-year period under Virginia Code § 18.2-31(8); capital murder of four-year-old Ruby Harvey while Gray was twenty-one years of age or older under Virginia Code 18.2-31(12); and capital murder of nine-year-old Stella Harvey while Gray was twenty-one years of age or older under Virginia Code § 18.2-31(12). *Id.* at 294.

### B. Penalty Phase of the Trial

During the penalty phase before the jury, the government introduced evidence of several other murders that Gray and Dandridge committed together, as well as a near-fatal assault. Specifically, the government introduced Gray's confession to murdering his wife Treva Gray, with Dandridge's help, by bludgeoning her to death with a lead pipe in November, 2005, approximately two months before the Harvey killings. *Id.* at 299; J.A. 1201-02. The jury also heard Gray's confession to murdering his accomplice, Ashley Baskerville, and Baskerville's mother, Mary Tucker, and stepfather, Percyell Tucker, in their home in Richmond, on January 6, 2006, less than a week after the Harvey murders. J.A. 1222-24; 1365. As to the Baskerville murders, the jury heard testimony from a medical examiner that Percyell Tucker had a sock stuffed in his mouth, taped shut, with his head covered with Saran Wrap and that he struggled for several minutes before he died from suffocation. *Gray I*, 274 Va. at 299. Mary Tucker was gagged, had duct tape placed over her eyes, was cut on her neck and chest four times, and struggled for several minutes before she died from suffocation. *Id.* Ashley Baskerville had a plastic shopping bag over her head, which was taped to her neck with duct tape, and had a sock stuffed in

4

her mouth with duct tape wrapped around her head. *Id.* She also struggled for several minutes before she died from suffocation. *Id.*

The government also introduced Gray's confession that he and Dandridge assaulted a man, Ryan Carey, in Arlington, Virginia on December 31, 2005, the night before the Harvey murders. After robbing Carey, they decided to kill him and stabbed him repeatedly, to the point that their two knives broke off inside of Carey's body. *Id.* at 300; J.A. 1419-21. Carey survived after two months in the hospital, though he lost the use of his right arm and has permanent scars throughout his body. J.A. 1436-37. Carey testified about the terror he had experienced and his father described how his son is "not the same boy." J.A. 1424-38. Also, Bryan Harvey's older brother and Kathryn Harvey's older brother each testified about his relationship with his murdered sibling and the grief and impact that the murders had on the extended families. *Gray I*, 274 Va. at 300. The government also introduced Gray's convictions for robbery in 1996, distribution of crack cocaine in 2000, and possession of cocaine in 2002. *Id.* at 299.

Gray's counsel offered mitigation evidence. Gray's mother, Barbara Moten, testified to Gray's abusive childhood. *Id.* at 300. She testified that his father, Ellsworth, spanked him with a "horse strap" and otherwise beat him when the school reported Gray had misbehaved, when he wet the bed, and when Gray's siblings blamed him for things that happened around the house. *Id.* When Gray's mother had to move because of her job with the Army, Gray, then age nine, stayed with Ellsworth, who became a cocaine addict while Gray's mother was gone. *Id;* J.A. 1506-07. Ellsworth's other son and Gray's half-brother, Fitzgerald, sexually abused Gray during this time period. *Gray I*, 274 Va. at 301. Gray's sister, Ava, testified about "repeated instances of sexual abuse upon her and Gray by Fitzgerald," with Gray "being victimized by Fitzgerald when he was only four years old." *Id.* Ava described the molestations as "a regular thing" over the course of seven

years. *Id.* Ava also testified that Gray turned to using drugs, specifically, marijuana, cocaine, and PCP, when he was just thirteen years old. *Id.*

Gray also presented the testimony of Dr. David Lisak, a psychologist and expert on the relationship between childhood abuse and later violent behavior. *Id.* Dr. Lisak opined generally, via video deposition, on the effects of early childhood abuse, and although he did not personally examine Gray, Dr. Lisak opined on the possible effects on Gray of his childhood experiences, as described to him by Gray's counsel. *See* State Pet. App. 354-69. Gray also presented the opinions of Dr. Mark Cunningham, a clinical and forensic psychologist, who testified that Gray would make a positive adjustment in prison, free from serious violence, pointing out that Gray had earned his GED during a previous period of incarceration. *Gray I*, 274 Va. at 301. In response, the government presented the testimony of Officer James Jonas of the Philadelphia Police Department, who testified about Gray's arrest. *Id.* Specifically, Officer Jonas testified that Gray punched him, resisted arrest, and attempted to grab the officer's gun. *Id.* at 302.

Following the conclusion of the evidence during the penalty phase, the jury deliberated for approximately 12 hours. At one point during their deliberations, the jury issued a note asking "what is the outcome if we are unable to arrive at a unanimous decision," in response to which the court refused to clarify its jury instructions. J.A. 1914-1915; State Pet. App. 385. After receiving the court's response, the jury deliberated approximately another eight hours over two days before deciding upon a sentence of life imprisonment for the murders of Bryan and Kathryn Harvey and death for the murders of Ruby and Stella, finding the aggravating factor of "vileness" applied to the murder of each of the children under § 18.2-31(12). J.A. 1915, 1963-67; *see* Va. Code § 19.2-264.4(C). The Circuit Court sentenced Gray in accordance with the jury's verdicts. J.A. 2022.

## C. Post-Trial Procedural History

Gray appealed his convictions and death sentences and the Supreme Court of Virginia affirmed on June 8, 2007. *Gray I*, 274 Va. at 315. He then filed his state habeas petition on March 14, 2008. *Gray v. Warden*, 281 Va. 303, 303 (2011) ("Gray II"). On March 4, 2011, with the exception of one claim, not relevant to this petition, the Supreme Court of Virginia dismissed each of the claims presented in his state petition. *Id.* at 320.[2] On May 12, 2011, Gray's execution was scheduled for June 16, 2011. On June 13, 2011, in anticipation of his filing his federal habeas petition, Gray filed in this Court a motion to stay his execution, which this Court granted on June 14, 2011. Gray filed his Petition for Writ of Habeas Corpus on August 29, 2011; the government filed its Motion to Dismiss on October 28, 2011; Gray filed his Opposition on December 12, 2011. On February 6, 2012, the Court held oral argument on the petition, following which it took the motion to dismiss under advisement.[3]

## II. Analysis

Under 28 U.S.C. § 2254(d), a federal court may grant habeas relief for claims that were adjudicated on the merits in state court if:

> adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[2] The Supreme Court of Virginia granted the state habeas petition with respect to one of Gray's ineffective assistance of counsel claims. Specifically, the Court found that Gray was denied effective assistance based on Gray's receiving two separate life sentences for the same crime. As the Court ruled, "the double jeopardy prohibition against multiple punishments is violated when a defendant receives separate sentences under Code § 18.2-31(7) and (8) when each of the constituent murders for both convictions occurred as part of the same act or transaction." *Gray II*, 281 Va. at 303-04.

[3] The Court also held a hearing on Gray's Objections to the Magistrate Judge's Order denying Gray's Motion for Discovery and Application for Fees and Expenses for Mental Health Experts, which the Court denied by Order dated December 2, 2011 [Doc. No. 44].

*See Appleby v. Warden*, 595 F.3d 532, 535 (4th Cir. 2010) (quoting *Cummings v. Polk*, 475 F.3d 230, 237 (4th Cir. 2007) (internal quotations omitted)).[4]  A state court's holding is "contrary to" clearly established federal law "'if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at' an opposite result." *Jackson v. Kelly*, 650 F.3d 477, 492 (4th Cir. 2011) (quoting *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010)).  A state court's holding is "an unreasonable application of" clearly established federal law when the state court "identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the particular case." *Id.* (quoting *Wheeler*, 609 F.3d at 300-01). In short, "to obtain federal habeas relief, 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in the existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011)).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  With respect to factual determinations, a federal court reviews only whether the state habeas court "based its decision on an 'objectively unreasonable' factual determination in view of the evidence before it . . . ." *Baum v. Rushton*, 572 F.3d 198, 210 (4th Cir. 2009) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).  The United States Supreme Court recently emphasized and made clear the very narrow scope of this Court's review of state habeas proceedings under these very demanding standards of review. *See Cullen v. Pinholster*, 131 S. Ct. 1388 (2011) (holding that the district court's review under § 2254(d) is limited to the evidence before the state

---

[4] The parties agree that all of Gray's claims have been exhausted in state court.

court). Based on these settle principles, the Court has considered Gray's claims in this Court, all of which fall into two categories: (1) *Brady* and *Napue* violations, and (2) *Strickland* ineffective assistance of counsel violations.

## A. Category I: *Brady* and *Napue* claims

Gray alleges both *Brady* and *Napue* claims. *Brady* held that a state violates a defendant's due process rights when it fails to turn over "evidence favorable to an accused . . . where the evidence is material." *Basden v. Lee*, 290 F.3d 602, 609 (4th Cir. 2002) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Favorable evidence can come in the form of exculpatory or impeachment evidence, and the suppression of that evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). A *Napue* violation occurs when the state knowingly offers or fails to correct false testimony. *Id.* at 614 (citing *Napue v. Illinois*, 360 U.S. 264 (1959)). A *Napue* claim requires (1) testimony that is false; (2) testimony that is material; and (3) the prosecutor's knowledge of the testimony's falsity. *Id.* The testimony is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Against these exacting standards and the requirements of Section 2254(d), the Court considers each of Gray's claims within this category of claims.

### 1. The government's reference during sentencing to Ray Dandridge's mental capacity and relative culpability

Gray's first claim is that the state prosecutor falsely stated during Gray's sentencing before the trial judge that Dandridge "was one or two points above the level of retardation, depending on when in his life he was tested and depending on who tested him." Dandridge had pled guilty pursuant to a plea agreement to capital murder in connection with the Tucker and Baskerville killings and was sentenced to life

9

imprisonment, instead of death, for those murders. State Pet. App. 207; Resp't Br. 35.  In support of Gray's argument that the trial court should impose life imprisonment rather than death for the Harvey children's murders, pursuant to its discretion under Va. Code. § 19.2-264.5, Gray's trial counsel argued that Dandridge was just as culpable as Gray and therefore Gray should receive the same sentence as Dandridge, life imprisonment.  In response to that position, the prosecutor argued based on a report issued by a Commonwealth-appointed psychologist concerning Dandridge's mental condition that Dandridge's IQ was "one or two points" above mental retardation, and for that reason it would have been difficult to obtain a death sentence for Dandridge. J.A. 2018-19.  Gray now argues that the prosecutor misrepresented Dandridge's mental capacity in that report, in violation of *Napue*, and that other information in that report, which was allegedly withheld before sentencing in violation of *Brady,* would have supported Gray's argument that Dandridge was equally culpable.  In state habeas proceedings, the Supreme Court of Virginia found that there was no *Napue* violation because the prosecutor's statement was not false and there was no *Brady* violation because, even if the report had been withheld improperly, the report was not material. *See Gray II*, 281 Va. at 304-05; State Pet. App. 207-220.

The psychologist's report listed the results of Dandridge's IQ tests at various points in his life, and one of his IQ scores was 72. State Pet. App. 210.  Under Virginia law, a classification of mental retardation requires, among other factors, an IQ score of 70 or lower. *Johnson v. Commonwealth*, 267 Va. 53, 75 (2004), *vacated on other grounds*, 544 U.S. 901 (2005); *Green v. Johnson*, 515 F.3d 290, 298 (4th Cir. 2008).  The Supreme Court of Virginia concluded that the prosecutor's statement (that Dandridge "was one or two points above the level of retardation, depending on when in his life he was tested and depending on who tested him") was not false, and in fact was true, even though a score of 70 or lower does not automatically establish mental retardation in Virginia.  It therefore

denied Gray's *Napue* claim. The Court cannot conclude that this judgment was unreasonable.

With respect to the *Brady* claim, the Supreme Court of Virginia held that the information within that report was not material, and therefore not a basis for relief, even if withheld improperly. *Gray II*, 281 Va. at 305.[5] The Court will therefore consider only whether the report was material. In that regard, it appears that the report was available to the prosecutor only at the time of Gray's sentencing, after the jury's verdict in the penalty phase;[6] and its materiality must be evaluated only within that context.

Under Virginia law, a court may reduce to life imprisonment a jury's recommendation of death only for "good cause." Va. Code § 19.2-264.5; *Bunch v. Commonwealth*, 225 Va. 423, 447-48 (1983).[7] Therefore, in order for any *Brady* evidence to be considered material, Gray must show that "there is a reasonable probability" that something in the report, if presented to the trial judge, would have resulted in the trial judge finding "good cause" for the imposition of a life sentence rather

---

[5] The AEDPA standard requires the Court to evaluate whether the state court's holding was "contrary to" clearly established federal law in that the "state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law." *Kelly*, 650 F.3d at 492. In its opinion, the state court explained that "[e]vidence is only material if its suppression would undermine the confidence in the outcome of the trial." *Gray II*, 281 Va. at 305 (citing *Teleguz v. Commonwealth*, 273 Va. 458, 488 (2007)). That formulation of the *Brady* standard for materiality is simply a different formulation of the more common standard ("reasonable probability that . . . the result of the proceeding would have been different"). These are effectively the same standard. *Compare United States v. Bagley*, 473 U.S. 667, 683 (1985) *with Strickler*, 527 U.S. at 280. Therefore, the Court finds that the state court did not arrive at a conclusion of law "opposite" to that reached by the Supreme Court.

[6] The evaluation, authored by Dr. Leigh Hagan, occurred in "September 2006." State Pet. App. 207. Gray's jury trial and jury sentencing ended in late August, and his post-sentencing hearing occurred on October 23, 2006. J.A. 1980, 1987, 1994.

[7] "After consideration of the [presentence report], and upon good cause shown, the court may set aside the sentence of death and impose a sentence of imprisonment for life. Notwithstanding any other provision of law, if the court sets aside the sentence of death and imposes a sentence of imprisonment for life, it shall include in the sentencing order an explanation for the reduction in sentence." Va. Code. § 19.2-264.5.

than death for the murders of the Harvey children. Here, Gray points to nothing definitive that establishes that Dandridge and Gray were equally culpable; and even though there was evidence that Dandridge had participated in the actual murder of Bryan Harvey, the evidence was that Gray, and Gray alone, killed Ruby and Stella and did so in a horrific manner. In light of this evidence, the state court found that the report, even if improperly withheld, would not have compelled the trial judge to find "good cause" to overturn the death penalty, which had been imposed only for the murders of the children Ruby and Stella. The Court must therefore conclude that the state court's determination that the alleged *Brady* evidence was immaterial was not unreasonable.

### 2. Detective Howard Peterman's Testimony and Gray's Drug Use

Gray alleges that the prosecutors presented false testimony at trial by Philadelphia detective Howard Peterman relating to Gray's interrogation that resulted in his written confession in Philadelphia. Specifically, Gray challenges: (1) the truthfulness of Peterman's negative answer to the question, "is there any aspect of your interview with Mr. Gray that we haven't gone over that leads up to the actual substance of the interview?" J.A. 993-94; (2) Peterman's related testimony that Gray was not told the substance of Dandridge's confession before Gray gave his written statement, when in fact he was "fed" facts from Dandridge's confession to adopt as his own; and (3) that Gray's written confession "constituted the entirety of Mr. Gray's statement." *See* J.A. 992-1000. In support of these claims, Gray's relies on Peterman's testimony in Culpepper, Virginia on February 4, 2008, during a hearing on another charge against Gray. During that hearing, Peterman testified that during his interview with Gray in Philadelphia, "I would tell Rick what I wanted to know about the incident . . . and if he had any information about it that he wanted to share with me." State Pet. App. 235. He also testified that he would find out what Gray knew before he committed anything to writing. *Id.* at 235-36. The state court found that these claims were procedurally barred because they were not

raised at trial or on direct appeal. *Gray II*, 281 Va. at 306. Gray claims that he could not have raised it on direct appeal because Peterman's Culpepper testimony took place after his direct appeal. Fed. Pet. ¶¶ 109-110

   In Virginia, claims that could have been raised on direct appeal, but were not, are procedurally defaulted and cannot be raised on state collateral review. *Slayton v. Parrigan*, 215 Va. 27, 29 (1974). Importantly, "a state court's finding of procedural default is not reviewable if the finding is based upon an adequate and independent state ground." *Wright v. Angelone*, 151 F.3d 151, 159 (4th Cir. 1998) (quoting *Williams v. French*, 146 F.3d 203, 208-09 (4th Cir. 1998)). "A state rule is 'adequate' if it is firmly established and regularly or consistently applied by the state court." *Jones v. Sussex I State Prison*, 591 F.3d 707, 715-16 (4th Cir. 2010) (quoting *Brown v. Lee*, 319 F.3d 162, 169 (4th Cir. 2003)). In determining whether a procedural rule is adequate, courts ask "whether the particular procedural bar is applied consistently to cases that are *procedurally* analogous." *Id.* (quoting *McCarver v. Lee,* 221 F.3d 583, 589 (4th Cir. 2000) (emphasis in original)). If the rule in *Slayton* represents an "adequate and independent state law ground for decision," then, absent a showing of "cause" or "prejudice" for the procedural bar, the Court cannot review the claim. *Wright*, 151 F.3d at 160 (quoting *Mu'min v. Pruett*, 125 F.3d 192, 196 (4th Cir. 1997)). In *Swisher v. True*, the Fourth Circuit affirmed *Slayton*'s application to a *Napue* claim. 325 F.3d 225, 230, 230 n.6 (4th Cir. 2003) (addressing only the "cause" and "prejudice" issue); *see also Bowman v. Johnson*, 282 Va. 359, 367-68 (2011) (applying *Slayton* to a *Napue* claim where counsel for the defendant had knowledge that allegedly false testimony was in fact false yet did not raise the issue at trial or on appeal). Here, the state court found that this claim was barred because Gray was present during the interview and was in a position to know whether Peterman's testimony was false or not during the trial and could have challenged that testimony at trial and on appeal. *Gray II*, 281 Va. at 306. The Court

agrees with the state court's finding. Gray's contention that this *Napue* claim is predicated on Peterman's Culpepper testimony over a year after his trial does not take this claim out from under the procedural bar created by Gray's knowledge at the time of the trial. At best, Peterman's later testimony only supported what Gray already knew at the time of trial; it does not excuse Gray from bringing the claim on direct appeal.[8]

Gray also alleges that the prosecutor falsely told the jury that Gray was not "under the influence of anything" when he committed the murders, even though, as Gray alleges, he told police he was on PCP the day of the murders. Fed. Pet. ¶ 107. The state court concluded that this claim was also barred under the *Slayton* rule because Gray would have known this statement was false when it was made and could have objected to it at trial or on appeal.[9] The Court again agrees that the claim is barred by *Slayton*.[10]

### B. Ineffective Assistance of Counsel Claims

Gray presents a wide variety of instances in which he contends he received ineffective assistance of counsel. For a petitioner to demonstrate ineffective assistance of counsel in state court, in violation of his Sixth Amendment right to counsel, he must satisfy the *Strickland* standard that "counsel's performance was deficient, and that the deficiency prejudiced the defense." *Kelly*, 650 F.3d at 493 (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). This

---

[8] Also in the record is the affidavit of Melvin Knight, Gray's trial investigator, who explains how in early 2006, prior to trial, Gray, in interviews with Knight, outlined the Philadelphia interrogation in detail, and provided his recollections that were arguably inconsistent with Peterman's trial testimony. State Pet. App. 221-23.

[9] This determination is also supported by defense investigator Melvin Knight's affidavit. As recounted by Knight based on his interview with Gray before trial, Gray told police during his interrogation that he could not remember many details of the crime because he was high on drugs at the time of the murders. *See* State Pet. App. 221.

[10] Gray contends that counsel's failure to discover and object to the *Brady* and *Napue* material was ineffective assistance and thus "cause" for the default. Fed. Pet. ¶ 98. The Court addresses that argument in the next section outlining the ineffective assistance claims.

two-part analysis from *Strickland* is a "high bar" and courts must assess trial counsel's efforts with "scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." *Kelly*, 650 F.3d at 493 (quoting *Harrington*, 131 S. Ct. at 788)). The "performance prong" requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012) (quoting *Strickland*, 466 U.S. at 687-88). In making that determination, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). However, even assuming that a petitioner can satisfy the "difficult standard" of the performance prong, the petitioner still must show "prejudice" to his case. *Id.* And, in a capital case, "the prejudice inquiry centers on whether there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Kelly*, 650 F.3d at 493 (quoting *Williams v. Ozmint*, 494 F.3d 478, 484 (4th Cir. 2007) (internal quotations omitted)). That showing "requires a substantial, not just conceivable, likelihood of a different result." *Id.* (quoting *Pinholster*, 131 S. Ct. at 1403).

As the Supreme Court has recently stated, "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington*, 131 S. Ct. at 788. For this reason, within the context of review under Section 2254(d), another level of deference is added to the already-deferential *Strickland* standard: "The standards created by *Strickland* and § 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly so.'" *Id.* (internal citations omitted). As a result, an exceptionally high standard applies: "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were

reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

As a result of these multiple layers of deference under § 2254(d), in order to obtain federal habeas relief based on the prejudice prong of a *Strickland* claim, the federal court must conclude that a state court's finding that there is no "reasonable probability" that the outcome of the trial would have been different in the absence of trial counsel's alleged errors "'was so lacking in justification that it was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement[.]" *Branker*, 668 F.3d at 141 (quoting *Harrington*, 131 S. Ct. at 786-87). Ostensibly because this standard is so difficult to satisfy, the United States Supreme Court counsels that *Strickland* claims should be decided based on the prejudice prong if that prong is dispositive. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). Applied here, these settled principles require Gray to demonstrate that the state court erred beyond "any possibility of fairminded disagreement" when it found that there was not a "substantial likelihood" that the jury would have recommended life in prison instead of the death penalty *even if* counsel had been effective; this standard requires the Court to consider Gray's claims within the context of his admitted killings of two young children by conduct that the jury found satisfied the aggravating factor of vileness pursuant to Va. Code § 19.2-264.4(C). *Gray I*, 274 Va. at 294; J.A. 1964-66. *See Kelly*, 650 F.3d at 495 (faulting the district court for failing to weigh the "considerable evidence regarding the horrific circumstances of [the defendant's] rape and murder of [the victim]" against potential mitigating evidence).[11]

---

[11] "Vileness" is defined as conduct that is "outrageously or wantonly vile, horrible, or inhuman in that it involved torture and-or depravity of mind, and-or aggravated battery to

### 1. Trial counsel was ineffective for failing to present *Brady* and *Napue* claims (Federal Claim I)[12]

Gray alleges that trial counsel was ineffective by failing to investigate and present the *Napue* violations (based on Detective Peterman's allegedly false trial testimony about Gray's confession and the prosecutor's statements about his drug use) that were procedurally defaulted under the rule in *Slayton*, discussed above. The state court found that Gray's ineffective assistance claims based on the procedural defaults satisfied neither the "performance" nor the "prejudice" prongs of *Strickland*. In reaching that conclusion, the state court relied on trial counsel's affidavit concerning what Gray told him[13] and also the tactical decisions made by trial counsel to avoid any arguments that drugs were to blame, because it would detract from their mitigation evidence of sexual abuse. *Id.* Based on this record, the Court must conclude that the state court's decision that Gray had not satisfied either prong of the *Strickland* analysis was not unreasonable.

### 2. Trial counsel was ineffective for failing to investigate, develop, and present evidence of relative culpability between Gray and Dandridge (Federal Claim II)

Gray alleges that he was denied effective assistance because counsel failed to (1) investigate, develop, and present evidence of relative culpability between himself and Dandridge; (2) investigate whether the police made Gray aware of the substance of

---

the victim beyond the minimum necessary to accomplish the act of murder . . . ." J.A. 1965-66; *see* Va. Code § 19.2-264.4(C).

[12] The numbering of the Federal Claims comes directly from Gray's Federal Petition.

[13] Trial counsel's affidavit affirmed that Gray did not tell them that the police fed him the details of the crime learned from Dandridge's confession and that Gray told counsel that "PCP" was not to blame for his actions and that "he knew what he was doing." Resp't Ex. B, at ¶¶ 9, 23. Trial counsel also affirmed, "[a]ny argument that Gray acted because of the influence of drugs was simply not supported by what the defendant told us." *Id.* at ¶ 23.

Dandridge's statements;[14] and (3) investigate the effects of PCP on Gray's memory. *Gray II*, 281 Va. at 307-310. The state court held that these allegations did not satisfy the "performance" or the "prejudice" prong of *Strickland*. *Id.* After reviewing the record, the Court must conclude that the decision of the Supreme Court of Virginia was not unreasonable.

In reaching its decision, the state court relied on trial counsel's argument to the jury during the penalty phase, and to the court after the jury's verdict, that Dandridge was just as culpable as Gray and that, because Dandridge received only a life sentence, Gray should likewise receive life sentences for the Harvey murders. *Gray II*, 281 Va. at 307-08. The state court also pointed out that the affidavit of Gray's counsel and Gray's statement to the police both demonstrate that Dandridge had a minimal role in the Harvey murders and that he told his counsel as much. *Id.* Given the record, the Court cannot conclude that it was unreasonable for the state court to conclude that there was not a "substantial likelihood" that further relative culpability evidence would have altered the jury's or the trial court's decisions to impose the death sentence on Gray.

The state court also ruled that Gray had failed to satisfy either the "performance" or the "prejudice" prong of *Strickland* based on his contention that Gray's written confession was put together only after Gray was provided details from Dandridge's self-servicing account, which assigned expansive culpability to Gray. *Id.* at 308. The state court found that Gray's allegations were uncorroborated while there was extensive evidence that Gray was not given any of the details of Dandridge's confession before his own confession. *Id.* In fact, it appears that Gray's statement was materially different than

---

[14] This claim is virtually identical to the ineffective assistance argument in Federal Claim I.

Dandridge's, with Gray's statement providing details consistent with the evidence that were not in Dandridge's statement. J.A. 2019, 1366-67 (prosecutor explaining that Dandridge confessed to slitting Baskerville's throat, but her throat was not slit; Gray confessed that the Tuckers had been cut, but not Baskerville); J.A. 1233-35 (description of Baskerville's autopsy which showed no cuts). After a review of the state habeas record, the Court must conclude that the state court's decision that there was not a "substantial likelihood" of a different result based on this contention was not "beyond the possibility of fairminded disagreement" and therefore not unreasonable.

Lastly as to this claim, the state court held that counsel's failure to investigate the effects of PCP on Gray's memory, which effects would have called into question the statement that Gray gave to the police, satisfied neither the "performance" nor the "prejudice" prong of *Strickland*. Gray's trial counsel's affidavit indicates that Gray repeatedly stated that PCP was not to blame and that "he knew what he was doing" and that any argument that drugs influenced that conduct "was simply not supported by what the defendant told us." Resp't Ex. B, at ¶ 23.[15] Further, the evidence gathered at the scene was consistent with Gray's statement. The state court's determinations that counsel was not deficient and that there was not a "substantial likelihood" of a different result had trial counsel further investigated the PCP issue were not unreasonable.

---

[15] "Resp't Ex." refers to the four evidentiary submissions that the Warden made before the Supreme Court of Virginia. Those exhibits are (A) Dr. Bernice Marcopluos's psychological evaluation of Dandridge, (B) the Affidavit of trial counsel, Jeffrey Everhart and Theodore Bruns, (C) Dr. Evan Nelson's evaluation of Gray, and (D) Dr. Bruce Cohen's evaluation of Gray.

### 3.   Trial counsel failed to make a reasonable investigation of Gray's statements to police (Federal Claim III)

In this claim, Gray alleges that trial counsel was ineffective because they failed to investigate the facts surrounding Gray's statement to police. Specifically, Gray alleges that he was unable to remember many details of the murders during the interrogation because he was under the influence of drugs when he committed the murders, and that his statement to police reflected information about the crimes that police provided to him from Dandridge's statement. Gray further alleges that had his counsel known that his statement was based information fed to him by police, they could have moved to suppress Gray's statement or, at the very least, impeached Detective Peterman's testimony at trial pertaining to Gray's statement.

The information pertaining to this claim that was before the state court was Gray's verified Petition, trial counsel's affidavit, Detective Peterman's trial testimony, and defense investigator Melvin Knight's affidavit.  In this regard, trial counsel affirmed that (1) Gray assured them he was not on drugs and that he knew what he was doing when he committed the murders; (2) Gray never said he was "fed details of the crimes"; and (3) trial counsel spoke with each officer involved with Gray's arrest and determined that Dandridge's statement was not given to Gray prior to his confession. Resp't Ex B, at ¶¶ 6-9. Detective Peterman's trial testimony affirmed the process by which Gray's confession was secured, with trial counsel cross-examining him on that topic.  At no point during that testimony did Detective Peterman state or suggest that he, or anyone else, fed Dandridge's version of what happened to Gray. J.A. 983-1014. This testimony differed sharply from Melvin Knight's affidavit, which affirmed that when he interviewed Gray following his arrest in February, 2006 and before trial, Gray told him

20

that he was fed details of Dandridge's statement before giving his own statement. State Pet. App. 222. Trial counsel's affidavit and Detective Peterman's testimony also conflicted with Gray's verified Petition which alleged in substance the same facts as presented in Melvin Knight's affidavit. *See* State Pet. 13-15.

The state court concluded that Gray had not satisfied either the "performance" or "prejudice" prong of *Strickland* with respect to this claim based on the affidavit of trial counsel, essentially adopting that affidavit as findings of fact. *See Gray II*, 281 Va. at 309-310. In proceeding in this fashion, the state court obviously engaged in making credibility determinations to resolve the facial conflicts between trial counsel's affidavit and Peterman's testimony on the one hand, and investigator Knight and Gray's affirmations in his petition on the other hand. Against this record, the Court must determine whether the state court's conclusions that the *Strickland* standard was not met was unreasonable or based on an unreasonable determination of fact.

Here, the state court made factual determinations with respect to conflicting evidence without an evidentiary hearing, based solely on the basis of a written record, presented to and considered by the state court without any opportunity for the petitioner to develop a factual record through discovery with compulsory process or to test disputed issues of fact through the type of adversarial process historically thought essential to the truth-finding function of a court.[16] The issue essentially reduces to whether, for the

---

[16] At oral argument, Petitioner represented that Virginia is one of the few, if not the only state, that prevents a state habeas petitioner from developing a factual record through compulsory process as a matter of right. Rather, all requests for discovery or an evidentiary hearing must be first presented to the Virginia Supreme Court for approval. *See* Va. S. Ct. R. 5:7A(h). In this regard, the Court notes the differences between the state court record in this case and the state court record reviewed in *Elmore v. Ozmint*, 661 F.3d 783, 787-88. 804, 875 (4th Cir. 2011) (record from South Carolina habeas proceedings included the transcript from a multiple day evidentiary hearing, with pre-

purposes of Section 2254(d), such state court proceedings result in inherently unreasonable determinations of fact, particularly with respect to conflicting evidence contained in that written record. The Court has found no court decisions or consideration of this precise issue, although the Court has considered the cases cited by the Petitioner that bear on this issue. *See, e.g., Nunes v. Mueller,* 350 F.3d 1045 (9th Cir. 2003); *Morris v. Thaler,* 425 F. App'x 415 (5th Cir. 2011).

The Court concludes, particularly in light of what is the clear legislative intent, as recognized by the Supreme Court, most recently in *Pinholster,* that Section 2254(d) affords wide latitude to state courts in fashioning state habeas procedures and that the procedures adopted by the state court were not, within the context of this case, inherently unreasonable or unreliable for the purposes of Section 2254(d). Applying the highly deferential standard of review embedded in Section 2254(d) to the state court proceedings, the Court finds, based on the totality of the state court record, that the state court's determinations of fact were not unreasonable; and that it was not unreasonable for the state court to conclude, based on those determinations, that trial counsel did not provide ineffective assistance. While the Court does not preclude the possibility that state court rules and procedures, by their nature, could result systemically in inherently unreasonable determination of fact under Section 2254(d), the Court concludes that this is not such a case.

The Court has also considered whether it was unreasonable for the state court to find that no prejudice flowed from any of the alleged failings on the part of trial counsel with respect to Gray's confession. Specifically, the Court has considered whether Gray

and post-hearing depositions, which resulted in a 183-page opinion with detailed factual findings.)

suffered any prejudice, even were the state court's factual determinations unreasonable, and that the a reasonable determination would have resulted in findings that (1) Gray's confession reflected details, not remembered by him, but provided to him by police based on what Dandridge said in order to deflect culpability away from himself and onto Gray; and (2) that trial counsel should have discovered those facts.

If Gray were fed details, his confession would not likely have been suppressed on that basis alone, but only made subject to impeachment through Peterman, Gray, or some other participant in Gray's interrogation. Assuming that such testimony could have been placed before the jury, it is conceivable that trial counsel could have raised a higher level of doubt in the jurors' minds about the role Gray actually played in the Harvey killings and whether the horrific nature of the murders, and the children's in particular, was at the hand of Gray or Dandridge. But the avenues through which trial counsel could have presented such evidence concerning Gray's statement were limited, and the practical opportunity to do so slim, if such any such opportunity existed at all. Detective Peterman was questioned at length about his discussions with Gray, by both sides, and there is no reason to think that Detective Peterman would have conceded that Gray was fed any details about the crimes. Similarly, there is little likelihood that Gray would have taken the stand solely for the purpose of providing that testimony. In short, the *fact* that Gray was fed details, even if true, likely would never have come out at trial; and it was not unreasonable for the state court to conclude that Gray had failed to satisfy the "prejudice" prong of the *Strickland* analysis.

A similar analysis applies to the second part of this Federal Claim III, in which Gray alleges that he asked for an attorney and a phone call before being questioned and that he was denied those requests in violation of his right to counsel. Counsel's failure to

investigate that claim, Gray alleges, was deficient and prejudiced him because it could have been grounds to suppress his confession or impeach the credibility of the government's witness who testified that Gray was the source of the statement. The state court held that this claim did not satisfy either the "performance" or the "prejudice" prong. Gray argues that the state court's decision was contrary to law, or an unreasonable determination of the facts, because the state court "ignored the evidence Gray presented and granted Warden's Motion to Dismiss the claim based solely on allegations the Warden proffered that conflicted with Gray's allegations." *See* Fed. Pet. ¶ 133.

As the Court discussed above, the fact that the state court made factual determinations based on conflicting evidence in the written record, without an evidentiary hearing, standing alone, does not make those findings unreasonable based on the totality of the record. Here, Gray's trial counsel affirmed that they actively looked for suppression issues and spoke to all police officers who had dealt with Gray after his arrest, but "could not find grounds for even a colorable claim to suppress any of the statements Gray made to law enforcement." In addition, the record, separate from trial counsel's affidavits, supports the conclusion that Gray knowingly waived his constitutional right to counsel prior to giving his confession. Resp't Ex. B, at ¶ 8; J.A. 1263, 1357, 1392, 895-97; 989; 1004-09 (evidencing Gray's waivers prior to his confessions). In light of the record before that court, the state court's conclusions that trial counsel was not deficient and that Gray was not prejudiced were not "based on an unreasonable determination of the facts" or beyond "fairminded disagreement."

### 4.   Trial counsel failed to protect Gray's rights to plead guilty and to have sentencing factors determined in a constitutional manner (Federal Claim V)

In this claim, Gray argues that trial counsel was ineffective by failing to protect Gray's right to plead guilty and to have the sentencing factors determined in a constitutional manner.  This argument is premised on the notion that Virginia's sentencing procedures are unconstitutional when a capital defendant pleads guilty and is sentenced solely by a judge.  In Virginia, a defendant who goes to trial is sentenced by a jury, and at a later hearing the judge actually issues the sentence, with discretion to downwardly depart from the jury's issuance of a death sentence for "good cause." Va. Code. § 19.2-264.5.  However, if the defendant pleads guilty, he is not given the benefit of a jury determination of his sentence and only the judge issues the sentence—he waives that right by operation of his guilty plea.  Gray alleges that this automatic waiver of the right to have a jury determine the aggravating factors of a death sentence in the aftermath of a guilty plea is unconstitutional, relying on certain Supreme Court case law. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004).

*Apprendi* involved a hate-crime statute in New Jersey that permitted a 20-year sentence, instead of the usual 10-year maximum, if the judge found that the crime was committed "with a purpose to intimidate . . . because of race, color, gender, handicap, religion, sexual orientation or ethnicity." *Apprendi*, 530 U.S. at 469.  After the defendant pled guilty to the underlying crime, the trial judge held an evidentiary hearing on the issue of the "purpose" for the crime, and ultimately decided that the sentence enhancement applied. *Id.* at 470-71.  The Court held that the judge's evidentiary hearing was constitutionally impermissible: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.  In *Ring v. Arizona*, the Supreme Court applied *Apprendi* to a state-law regime that, following a jury

adjudication of guilt, authorized the trial judge to affix the death penalty if the judge found, after a separate hearing, that an aggravating factor applied. *Ring*, 536 U.S. at 592. The Court held, as in *Apprendi*, that the defendant had the right to a jury to make those factual determinations.

The Fourth Circuit recently addressed an ineffective assistance claim similar to the one presented here. *See Lewis v. Wheeler*, 609 F.3d 291 (4th Cir. 2010). There, the Court explained that in order to prevail on this claim, the petitioner "must demonstrate that a reasonably competent attorney would have believed that [Supreme Court case law] established that a defendant who pleads guilty to a capital offense and waives his or her right to a jury trial nevertheless retains a right to a jury determination of aggravating factors." *Id.* at 309. The petitioner "must also demonstrate that counsel's failure to raise the issue with [the petitioner] prejudiced [the petitioner] because, had they done so, there is a reasonable probability that the outcome of her sentencing proceeding would have been different." *Id.* The Fourth Circuit held that *Ring* "did not clearly establish or even necessarily forecast that a capital defendant who pleads guilty and waives his right to a jury trial can insist upon a jury trial on aggravating factors." *Id.* at 310. As a result, the Court held that counsel's failure to raise the constitutionality of Virginia's scheme or to discuss it with the petitioner was not objectively unreasonable performance. *Id.* at 310. The Court sees no material difference between the petitioner's argument in *Lewis* and Gray's argument here, especially given the state court's reasonable factual conclusion that "counsel advised petitioner not to plead guilty in order to preserve his right to appeal and that petitioner understood and agreed with that advice." *Gray II*, 281 Va. at 311. The Court recognizes that *Lewis* was decided without application of the rule announced in the Supreme Court's decision in *Blakely*; but *Blakely* did not so clearly settle the issue such that it was objectively unreasonable not to object to the Virginia sentencing regime. *See Lewis*, 609 F.3d at 310 n.6. Nevertheless, even assuming that counsel was deficient for

not properly objecting to the Virginia statute and, had counsel objected, Gray would have been able to plead guilty and still have a jury involved in the penalty phase, Gray cannot demonstrate prejudice.

Gray argues that he was prejudiced because a guilty plea would have permitted him to "confirm his remorse, and accept an appropriate degree of culpability" in front of the jury. Fed. Pet. ¶ 138. However, the record reflects that Gray effectively proceeded as if he had entered a guilty plea. From opening statement through the end of trial, Gray's trial counsel conceded Gray's guilt and stressed Gray's acceptance of responsibility and his remorse. J.A. 893-99; 1878-80. It is possible that a guilty plea may have excluded some of the horrifying details of the crimes, *see Lewis*, 609 F.3d at 312, but the jury still would have heard most, if not all of those details, during the penalty phase. Given the nature of the crimes, the marginal, possible benefit of an actual guilty plea does not establish a "substantial likelihood" of a different result; and the Court cannot conclude that the state court's determination that neither the "performance" nor the "prejudice" prongs were satisfied was unreasonable.

## 5. Trial counsel failed to object to prosecutor's impermissible comment on Gray's failure to testify (Federal Claim VI)

This claim alleges that the government unconstitutionally referenced Gray's decision not to testify and asked the jury to make inferences therefrom and that counsel was ineffective for failing to object. Specifically, during closing argument during the guilt phase, the prosecutor told the jury "as I stand here, [Gray] offered no apology, he offered no remorse" for the murders, and that "Ricky Gray never said he was under the influence of anything." J.A. 1148, 1159-60. The state court decided that this claim did not satisfy the prejudice prong because the trial transcript "demonstrates that the statements were not a comment on [Gray's] failure to testify at trial but rather called the jury's attention to [Gray's] demeanor and responses during his confession to police."

*Gray II,* 281 Va. at 311. The first statement, that Gray offered no apology, came immediately before the prosecutor began outlining exactly what Gray confessed to and how that confession was corroborated by evidence. Upon reviewing the transcript, the Court concludes that the first statement was in reference to the confession, and not in reference to Gray's failure to testify. The Court therefore concludes that the state court's conclusion was not unreasonable and was, in fact, correct.

The second allegedly inappropriate statement came during the final portion of the prosecutor's closing argument. The prosecutor stated that Gray "never said he was drunk . . . never said he was beside himself . . . never said he as under the influence of anything." J.A. 1159-60. Gray argues that this statement was alluding to Gray's choice not to testify. However, a contextual reading of the statement leads to a different conclusion. Prior to that statement, the prosecutor spoke to the needlessness of the murders, asking "Why did he need to kill anybody?" J.A. 1157. And then the prosecutor noted Gray did not give a reason for the murders, stating "you didn't even get [the reason] *at the time.*" J.A. 1158 (emphasis added). A review of the transcript shows that "at the time" clearly was in reference to the confession. *See* J.A. 1159-60. The later statements that "Gray never said he was drunk . . . never said he was beside himself . . . never said he was under the influence of anything" are a continuation of the discussion of his confession, and not a commentary on his failure to testify. Therefore, the prosecution did not inappropriately reference his silence at trial.

Further, the record includes Gray's trial counsel's explanation that an objection to those statements, had one been appropriate, would have been less effective than answering the argument in their own closing. Resp't Ex. B, at ¶ 30. Trial counsel explained that they wanted to use evidence to rebut the prosecutor's argument that Gray

expressed no remorse; and counsel did just that, pointing out that Gray stated in his confession, "Sorry is not strong enough." J.A. 1161-63. Within the context of the trial as whole, any prejudice that the prosecutor's statements could have caused during the penalty phase was minimal, at most. Therefore, the Court concludes that the state court's determination there was not a "substantial likelihood" of a different result due to the alleged error was not unreasonable or "beyond the possibility of fairminded disagreement."

### 6. Trial counsel failed to ensure jurors were properly instructed (Federal Claim VII)

The first part of this claim alleges that trial counsel was ineffective in failing to act as required with respect to the trial court's instruction that incorporated the statutory definition of "vileness"; the second part of this claim alleges that trial counsel was ineffective for failing to object to the trial court's refusal to instruct the jury further regarding their question concerning the consequences of not reaching a unanimous verdict as to penalty.

Gray was sentenced to death for the murders of Ruby and Stella, which the jury found to be "vile" under Va. Code § 19.2-264.4. J.A. 1931, 1938. Trial counsel objected to the statutory definition of vileness on the grounds, *inter alia*, that it was unconstitutionally vague under the holding in *Godfrey v. Georgia*, 446 U.S. 420 (1980), and argued that the vagueness "is exacerbated by Virginia's failure to require jury instructions as to the meaning of these terms." J.A. 170-71; State Pet. App. 260-61. The trial court rejected that challenge. J.A. 244. Gray claims that trial counsel was ineffective because, after the motion was denied, counsel did not tender alternative jury instructions to cure the alleged constitutional violation. The state court found that this claim did not satisfy either the "performance" or the "prejudice" prong because the trial court's jury

instruction properly tracked the constitutionally valid language of the "vileness" statute. *Gray II*, 281 Va. at 311-312. Given the trial court's decision explicitly rejecting Gray's constitutional challenge to the "vileness" statute, and the constitutionally valid instruction that was given, the Court concludes that the state court's determination that Gray failed to demonstrate either deficient performance or prejudice as a result of that performance was not unreasonable.

Likewise, it was not unreasonable for the trial court to conclude that neither the "performance" nor the "prejudice" prongs of *Strickland* were satisfied with respect to counsel's failure to request a jury instruction that a non-unanimous decision would result in a life sentence instead of a death sentence. After deliberating for some time, the jurors sent a question to the trial court judge asking, "What is the outcome if we are unable to arrive at a unanimous sentencing decision?" State Pet. App. 385. Virginia law states that when jurors do not reach a unanimous sentence in a capital case, the defendant receives life imprisonment without parole. Va. Code. § 19.2-264.4(D). Gray claims that the trial court's decision not to answer the question misled the jury members into believing that their decisions about the existence of any individual piece of mitigating evidence, and the impact of that evidence, had to be unanimous because the only instruction the jurors received was that "*any* decision you make regarding punishment must be unanimous." J.A. 1920 (emphasis added); *see* Fed Pet. ¶ 162. Gray argues that counsel's failure to request an instruction that explicitly stated the consequences of a non-unanimous decision was ineffective assistance of counsel. But this position conflicts with both the instructions, taken as a whole,[17] and the holdings of the Virginia Supreme Court that such

---

[17] For example, Gray claims that the "only instruction jurors received on unanimity" was the instruction explaining that "[a]ny decision you make regarding punishment must be

instructions as Gray proposes here are "unnecessary" and "confusing." *See Juniper v. Commonwealth*, 271 Va. 362, 426 (2006) (quoting *Clark v. Commonwealth*, 220 Va. 201, 212 (1979)). Based on the record, the Court concludes that the state court's decision that this claim failed to satisfy either prong of *Strickland* was not unreasonable.

### 7.  Gray was unconstitutionally excluded from a jury misconduct hearing at which counsel should have requested a mistrial (Federal Claim VIII)

On the second day of the penalty phase of the trial, two jurors alerted the court about inappropriate conduct by a third juror that caused concern that the third juror had already made up her mind as to the death penalty. *See* J.A. 1608-1636. At this point, Gray had already been escorted out of the courtroom, but the attorneys were still in the courtroom; and outside Gray's presence, the judge questioned those two jurors and the third juror to ensure that none had made their mind up and that none had any inappropriate contact or discussions about the case. None had. The judge explained what had occurred to the jury as a group and then dismissed them for the weekend. Gray's trial counsel moved that Gray's appearance at that hearing be waived, after the fact, and the trial court required counsel to discuss what had occurred with Gray and that if counsel needed a transcript to assist in that meeting, one could be provided. J.A. 1637. The record includes trial counsel's affirmation that they met with Gray, discussed what had occurred, and reviewed options with him. Resp't Ex. B, at ¶ 15. Gray now claims that

---

unanimous." Fed. Pet. ¶ 161. However, that same instruction states "[b]ut if you nevertheless believe from *all of the evidence*, including evidence in mitigation, that the death penalty is not justified, then you shall fix the punishment of the defendant at . . . Imprisonment for life . . . ." J.A. 1920 (emphasis added).

counsel never discussed the hearing with him and that by failing to protect his right to be present at the crucial stages of the trial, counsel was deficient.[18]

The state court found that this claim failed to satisfy the "prejudice" prong of *Strickland*; and the Court concludes that this determination was not unreasonable. A defendant is "guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). However, the defendant need not be present "when presence would be useless, or the benefit but a shadow." *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934)). Here, the trial court questioned the three jurors extensively and each said that they had not reached any conclusions and that they would be objective through the end of sentencing evidence. J.A. 1608-1637. There is nothing in the record to suggest that Gray's presence would have been more than "but a shadow." Further, notwithstanding Gray's position now, the state court's finding that Gray did not have any concerns regarding his absence was not an "unreasonable determination of fact" given trial counsel's affidavit stating that they advised Gray of what occurred and Gray "never said that he was worried about the jury being biased." Resp't Ex. B, at ¶ 15.

### 8. Counsel failed to provide effective representation at sentencing (Federal Claim IX)

This claim concerns several instances where Gray alleges that trial counsel was ineffective at sentencing.

---

[18] Gray appears to have abandoned his arguments in state court that trial counsel was ineffective for (1) not making further inquiry into the third juror's misconduct, (2) failing to request a mistrial (notwithstanding this section's title), (3) failing to object to the court's finding that its instructions to the jury had not been breached, and (4) failing to memorialize in a transcript the hearing for Gray to review. *See* Fed. Pet. ¶¶ 168-182; *Gray II*, 281 Va. at 313-15. Therefore, the Court does not address those arguments.

First, Gray alleges that counsel did not present enough mitigation testimony regarding his horrific childhood.  More specifically, Gray alleges that counsel "unreasonably cut short their investigation and disregarded investigative 'red flags' highlighting the need for further investigation." Fed. Pet. ¶ 185.  Though counsel knew of the toxic environment in which Gray grew up, they conducted only a "cursory investigation" into that history and failed to present a complete picture of Gray's childhood. *Id.*  According to Gray, counsel's failures "prevented jurors from linking Gray's life experiences with his behavior, his crime, and his moral culpability." *Id.*  In support of this contention, Gray provides affidavits of his father, mother, brother, sisters, and several other family members who, had they been called to testify, would have testified about Gray's "addiction to drugs, the physical and sexual abuse [Gray] was subjected to as a child by his father and half-brother, the absence of [Gray's] parents from portions of his childhood, and the environment of drugs and crime [Gray] was exposed to where he lived." *Gray II*, 281 Va. at 315-16.[19]  The state court found that this claim did not satisfy either the "performance" or the "prejudice" prong of the *Strickland* test.  With respect to the performance prong, the state court explained that trial counsel did put on mitigating evidence of Gray's childhood through the testimony of his mother and sister.  The state court concluded that "counsel's decision not to seek more mitigating evidence from [Gray's] background than was already in hand falls well within the range of professionally reasonable judgments." *Id.* at 316 (quoting *Bobby v. Van Hook*, 130 S. Ct. 13, 19 (2009) (internal modifications omitted)).  The state court also held that Gray did

---

[19] Gray provides new affidavits in his federal petition, which provide additional details of his horrific childhood.  However, the Court's review is limited to the evidence that Gray presented to the state court and may therefore not consider the new affidavits. *See Pinholster*, 131 S. Ct. at 1398.

not demonstrate prejudice as a result of counsel not seeking other testimony because any further testimony would have been cumulative.

For the purposes of post-trial review, trial decisions about what evidence to present, particularly whether to present cumulative evidence, are viewed as falling within the category of decisions committed to reasonable professional judgments. *Bobby*, 130 S. Ct. at 19. While failing to investigate and present *any* mitigating evidence when such evidence is available can arise to ineffective assistance, *see id.*, that is not what occurred here. At trial, Gray's mother testified about his childhood and many of its difficulties. *Gray I*, 274 Va. at 300-01. Gray's sister testified about the sexual abuse that Gray endured and Gray's childhood drug use. *Id.*; J.A. 1525-31 (testifying that their half-brother regularly raped her and Gray in each other's presence starting when Gray was only four years old and continuing for years). While other testimony on Gray's childhood could have presented additional instances of a traumatic childhood,[20] the Court cannot conclude that it was unreasonable for the state court to decide that counsel was not ineffective for failing to put on more mitigating evidence or that there would be a substantial likelihood of a different result, had trial counsel done so.

Gray's second contention within this claim is that trial counsel failed to present corroborating evidence of Gray's sexual abuse as a child. The state court found that this claim did not satisfy the "performance" or the "prejudice" prong of *Strickland*.[21] With

---

[20] The Court notes in this respect trial counsel's affidavit stating that Gray did not want even his mother and sister to testify and that counsel had to convince him to permit them to be called as witnesses. Resp't Ex. B, at ¶ 24.

[21] This claim is similar to the previous one, but because the state court addressed it separately, the Court does as well. Because the Court finds that the state court's decision that there was no prejudice was reasonable, the Court does not address the performance prong.

respect to the "prejudice" prong, the state court held that the information was cumulative

of the testimony by Gray's mother and sister and, for that reason, Gray did not

demonstrate that there was a reasonable probability that, but for the alleged error, the

sentencing result would have been different. *Gray II*, 281 Va. at 316-17. An alleged

failure to present cumulative evidence does not equate to prejudice, *Bobby*, 130 S. Ct. at

19, and corroborative evidence is largely cumulative. Given the nature of the murders,

there is not a reasonable probability that the corroborative evidence would have changed

the outcome. The Court therefore concludes that the state court's determination that there

was not a "substantial likelihood" of a different result due to the alleged error was not

"beyond the possibility of fairminded disagreement."

Gray's third contention is that trial counsel failed to investigate and present

evidence that Gray suffered from post-traumatic stress disorder (PTSD) as a result of his

upbringing. The state court found that this claim did not satisfy either the "performance"

or the "prejudice" prong of *Strickland*. At the time of trial, counsel did not have evidence

that Gray suffered from PTSD. In fact, the two physicians who examined Gray, Drs.

Cohen and Nelson, found that there was no evidence of a mental defect. Resp't Ex. B, at

¶ 17; Ex. C, at 12; Ex. D, at 4 ("There is no information available at this time to indicate

that Ricky Gray was experiencing an extreme mental or emotional disturbance at the time

of the alleged offenses."). Gray's allegation that Dr. Cohen's report had "red flags" that

counsel should have heeded and investigated further is immaterial. *See Spencer v.

Murray*, 18 F.3d 229, 235-36 (4th Cir. 1994) ("A claim for ineffective assistance of

counsel requires us to look at counsel's conduct, not at the experts who aided counsel.").

Here, trial counsel's alleged failure to investigate PTSD "red flags" that an expert himself

did not deem indicative of an emotional disturbance, cannot be deemed objectively

unreasonable. Likewise, the state court's decision that no prejudice resulted from a failure to present mitigating evidence of PTSD was not unreasonable. Explaining to the jury that Gray had PTSD would have been of little benefit to Gray when juxtaposed with the nature of the murders. At the very least, the state court's determination that there was not a "substantial likelihood" of a different result due to the alleged error was not "beyond the possibility of fairminded disagreement."

Gray next argues that trial counsel was ineffective for failing to present expert testimony to explain the impact of Gray's drug use on his moral culpability or the impact of all the mitigating evidence on Gray's moral culpability. In short, Gray alleges that an expert's opinion connecting Gray's horrific childhood and drug use to his moral culpability for the murders would have been crucial mitigation testimony, without which the prosecutor was free to argue that Gray's difficulties in life had nothing to do with his committing the murders. Gray specifically points to Dr. Cohen's report and statement that "[s]everal potentially mitigating factors . . . appear to be present in Mr. Gray's case. Given that each of these factors has been associated in the research literature with an increased propensity toward interpersonal violence in males, these factors likely facilitated his behavior at the time for the present offense." Resp't Ex. D, at 7.

The state court held that these claims did not satisfy the "performance" or the "prejudice" prong of the *Strickland* test. The Court concludes that this decision was not unreasonable. Among other evidence in the record, Dr. Cohen told counsel that his testimony would hurt, more than help, Gray's case, and counsel made the tactical decision not to have Dr. Cohen testify because his testimony would expose Gray's violent character along with whatever favorable testimony Dr. Cohen would provide. Resp't Ex. B, at ¶¶ 18, 20. Instead, counsel decided to have Dr. Lisak, who did not evaluate Gray,

explain to the jury why victims of sexual abuse act out violently, in a general sense, so as to connect Gray's past, his drug use, and his moral culpability without the concern of exposing Gray's darker side on cross-examination. Resp't Ex. B, at ¶ 21. Dr. Lisak opined on the effects of physical and sexual abuse and testified that it would not surprise him to learn that a person who had experiences like those of Gray would have committed serious acts of violence. State Pet. App. 366. He opined that a person like Gray would be "in a very high-risk category for being violent." *Id.* Using Dr. Lisak to provide that testimony, instead of Dr. Cohen, was "well within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699. In fact, given Dr. Cohen's statement that he would hurt more than help the defense, using Dr. Lisak appeared to be the best possible way to provide the type of "connect-the-dots" testimony that Gray alleges was lacking— he had all the benefits of that type of testimony and none of its drawbacks. As such, the trial court's decision that this claim did not satisfy the "performance" prong was not unreasonable.[22]

Even if using Dr. Lisak instead of another expert who had evaluated Gray was deficient performance, Gray cannot be said to have sustained any prejudice. The only testimony that a doctor who evaluated Gray could provide that Dr. Lisak could not is testimony that was less theoretical, though having effectively the same substance. The state court's conclusion that Gray was not prejudiced by the marginal benefit he might have received from a more fact-based, rather than theoretical, discussion of his past through another expert that had evaluated Gray is not unreasonable.

---

[22] As previously discussed, Gray himself told trial counsel that drugs were not to blame, adding further support to the conclusion that counsel was not ineffective for failing to present different expert testimony on that issue. *See* Resp't Ex. B, at ¶ 23.

Gray also argues that trial counsel failed to present evidence that reflected his capacity for good works. In this regard, Gray points to his attempted enlistment into the Army in 1996 (he was rejected), good conduct in a pre-release center in 2004 and 2005, success in work release, and his volunteering to fix a church furnace on Christmas day just days prior to the Harvey murders, all of which would have painted a more complete picture of Gray as more than just a cold-blooded murderer. State Pet. 44-46; Fed. Pet. ¶ 204. Trial counsel's failure to discover this information and present it at the sentencing phase, Gray argues, was ineffective assistance of counsel. The state court found that this claim did not satisfy either the "performance" or the "prejudice" prongs of *Strickland*. Even assuming that a failure to discover and present this information was deficient performance, the Court cannot conclude that the state court's determination that this alleged failure did not prejudice Gray was unreasonable. Given the nature of the crimes, it is not reasonably likely that these "glimmers of hope," as Gray calls them, would have affected the jury's decision. Therefore, the state court's determination that there was not a "substantial likelihood" of a different result due to the alleged error was not "beyond the possibility of fairminded disagreement."

### 9. The cumulative character of trial counsel's performance and resulting prejudice denied effective assistance (Federal Claim X)

Gray claims that the cumulative character of all of counsel's alleged errors resulted in prejudice that deprived him of effective assistance of counsel. The state court held that because none of the individual claims resulted in prejudice, there was no support that those claims taken together resulted in prejudice. The Court has reviewed the entirety of the alleged errors and the potential prejudice that allegedly flowed from

those errors, and concludes that the state court's determination that the cumulative nature of the alleged errors did not establish prejudice was not unreasonable.

### III. Conclusion

For the above reasons, the Court concludes that the decisions of the Supreme Court of Virginia with respect to petitioner's federal constitutional claims were not contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and were not based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings. Respondent's Motion to Dismiss [Doc. No. 31] will be granted and Petitioner's Petition for a Writ of Habeas Corpus [Doc, No. 18] will be dismissed.

An appropriate Order will issue.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.

/s/

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
April 27, 2012